STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-55

BRANDY MEGAN BROUSSARD WADSWORTH

VERSUS

CHRISTOPHER DAVID WADSWORTH

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20092292
HONORABLE SUSAN L. THEALL, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Van H. Kyzar, Sharon Darville Wilson, and Gary J. Ortego, Judges.

AFFIRMED.

Scott M. Hawkins
Hawkins & Associates, LLC
913 South College Road, Suite 260
Lafayette, LA 70503
(337) 210-8818
COUNSEL FOR PLAINTIFF/APPELLANT:
    Brandy Megan Broussard Wadsworth

Logan R. Istre
Istre Family Law Firm, LLC
225 West Main Street
Lafayette, LA 70501
(337) 456-2777
COUNSEL FOR DEFENDANT/APPELLEE:
    Christopher David Wadsworth

Christopher David Wadsworth
27955 Sam Herring Road
Independence, LA 70443
(337) 852-2410
In Proper Person

**KYZAR, Judge.**

In this custody matter, the plaintiff, Brandy Megan Broussard Wadsworth, appeals from a trial court judgment in favor of the defendant, Christopher David Wadsworth, modifying a prior custody decree and designating him as the domiciliary parent of their minor son. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Brandy Megan Broussard Wadsworth (Brandy) and Christopher David Wadsworth (Christopher) were married in Lafayette Parish on June 10, 2002. Three children were born during their marriage, of which only the two youngest, Micah Ellis (d.o.b. 4/6/07) and Marley Sarah (d.o.b. 7/7/08), are still minors. Prior to the parties' June 21, 2010 divorce, a consent decree was entered on July 9, 2009, whereby the parties were awarded joint custody of the children, with Brandy being designated as the domiciliary parent. Following the divorce, Christopher remarried and relocated to Independence, which is located in Livingston Parish.

This appeal stems from an August 26, 2022 ex parte petition filed by Christopher, whereby he sought temporary sole custody of Micah as well as a modification of the prior custody decree, with him being granted sole custody of Micah. He further sought a reduction of his child support obligation. The trial court, after denying Christopher's request for temporary custody, set the matter for hearing. Christopher later amended his petition to request that the prior custody decree be modified to designate him as Micah's domiciliary parent. Following the resolution of some pre-trial issues, this matter proceeded to a trial on the merits on August 7, 2023. At the start of the hearing, the trial court conducted a *Watermeier*[1] hearing

---

[1] *Watermeier v. Watermeier*, 462 So.2d 1272 (La.App. 5 Cir.), *writ denied*, 464 So.2d 301 (La.1985).

with Micah and Marley at the request of both parties. It also heard testimony from the parties and four other witnesses.

Christopher testified that at the request of Micah, he sought permission from Brandy for Micah to attend school in Livingston Parish. He said that Micah appeared anxious about returning to Ovey Comeaux High School (OCHS) in Lafayette, as "he felt as though there was drug activity and violence around him." He said that Brandy agreed that Micah could change schools in texts exchanged between them. On July 5, 2022, she stated, "Sounds like Micah really wants to go to school over there, I'm really busy at work so I really can't get away." Christopher responded that he would unenroll Micah from OCHS. On July 8, 2022, after Christopher requested copies of Micah's birth certificate and vaccination records, Brandy emailed him links to the Louisiana Department of Health's website. On July 20, 2022, she texted Christopher a photograph of Micah's Social Security card so he could finalize Micah's registration at Doyle High School (DHS). In another text, she told Christopher that he needed a certified copy of Micah's birth certificate as he would require it "for other things throughout the year[.]" Despite her purported agreement, Brandy removed Micah from DHS approximately two weeks after school started and reenrolled him at OCHS. Christopher admitted that Micah did very well, grade wise, during the tenth grade at OCHS and that he never complained that he was bullied there.

Christopher, an officer with the Livingston Police Department, said he requested the custody modification because Micah wanted to live with him. He has been married to his wife, Summer, for ten years, and they own their four bedroom, two-and-a-half-bath home, which is located on six acres in Independence. He stated that Micah has bonded with Summer, who is a special education teacher, and they

2

are absolutely ready to accept him into their home. He stated that Micah enjoys riding their horses and accompanying them to rodeos and that he would like to also compete in rodeos.

Christopher testified that Micah wants to return to DHS, which is a smaller school attended by his two daughters, and enroll in an auto mechanic program offered through the school. However, he was not aware that Micah had been accepted into a similar program offered through OCHS. He said that Micah also has several job opportunities available to him in Livingston Parish: working for a disabled-veteran friend and mentor, working on a hay and cattle farm, and participating in an internship with a local agricultural-supply company.

While Christopher admitted that he quit school in the eleventh grade, he obtained a General Educational Development (GED) diploma. He denied that he ever served in the military. He further denied that Micah ever competed in a rodeo or was injured while doing so in his custody. He explained that Brandy objected to Micah's participation in rodeos until he received a medical clearance for a prior injury. Although she said she would obtain the clearance, she had not done so by the date of the hearing. Christopher stated that when asked, Micah said he had suffered a wrist injury from wrestling. However, he said he did not know why he required a medical clearance as he had played football since that injury.

Christopher felt that counseling was good for Micah since it gave him someone to talk to other than him or Brandy. He said that he was not seeking custody of Marley as she was very involved in her social circle and band and seemed to be doing well in Lafayette. He admitted that he had previously told Brandy that his child support payment would be canceled if he had custody of Micah and Brandy

3

had custody of Marley and that his pay was currently being garnished for his past-due child support.

Summer testified that she loves Micah and has a great relationship with him, and he enjoys spending time with them. She said that Micah is close to her two daughters, especially her oldest, who live with them, and he enjoys working outside and attending rodeos while with them. Summer, who is a special education teacher in Livingston Parish, holds three bachelor's degrees in education and is currently working on a master's degree in special education, with a concentration in educational diagnostics. As a special education teacher, she is familiar with special education requirements and 504 Plans,[2] and she will assist Micah in getting a 504 Plan at DHS if he goes to school there.

Brandy claimed that other than Micah and Marley growing up, there have been no material changes in her or Christopher's lives since the July 9, 2009 consent decree. She further claimed that it would not be in Micah's best interests to live with Christopher for the following reasons:

> I worry that since he's in the 11[th] grade and that Christopher didn't finish high school that he's just going to allow him to quit because he wants to be a big boy. He wants to be grown up. I worry about that. I worry about him being in the close proximity to his cousin who is and that I've known to be a big drug user and he would be a lot closer cause that's on Christopher's side of the family. So that concerns me too.

Brandy opined that it was in Micah's best interests that he remain with her as he has everything he needs in Lafayette Parish, whereas nothing is guaranteed to him in Livingston Parish. She testified that Micah's OCHS file contains no record that

---

[2] "A 504 Plan is developed for students who have a disability, that do not require special education services." https://www.nea.org/professional-excellence/student-engagement/tools-tips/differences-between-504-plan-and-individualized-education-program-iep (last visited September 5, 2024).

he was ever bullied, and he never complained to her that he was bullied or beat up at school. Brandy testified that Micah admitted that his drug-related concerns with OCHS were based on second-hand statements rather than first-hand experience. She claimed that he only became concerned after he exchanged text messages with Christopher regarding a drug bust Christopher was involved in. She agreed that Micah did not appear to be "overly concerned or threatened by the fact that there's drugs in Livingston Parish[.]"

Brandy further felt that it was not in Micah's best interest to live with Christopher as this would split up him and Marley. She felt that splitting them up would adversely strain their relationship because they would think they were required to choose sides, parent-wise, and because it would reduce their time together. She said that Marley does not want to lose her relationship with Micah as they have been together since birth. She testified that even though they argue, they still love each other. Brandy claimed that Marley felt that Christopher had influenced Micah's request by buying him a horse, getting him a job, trying to get him a truck, and pointing out the advantages of living in a small town, and she was hurt because she felt he was pushing her away since "she doesn't fit his mold." However, Brandy admitted that Micah's request to live with Christopher occurred prior to Christopher's alleged manipulative actions.

Brandy agreed that Micah is closer to his older sister, McKenzie, which she based on the fact that McKenzie's husband is in the military. She stated that when they were younger, Micah's relationship with McKenzie was similar to his relationship with Marley. While his relationship with McKenzie has strengthened over time, she did not feel that his relationship with Marley would strengthen if they were separated. She opined that Micah and McKenzie's relationship is now stronger

5

as they are aligned with "a specific side of the family." She acknowledged that McKenzie moved out of her home and lived with Christopher for six months after she turned eighteen.

Brandy explained that Marley participates in the band at OCHS and that Micah participates in Future Farmers of America (FFA). Micah regularly attends games where Marley performs because he helps cook and sell food prepared by the FFA, after which he hangs out with his friends. Although she said that he has a lot of friends at school, he only spends time at their homes for events such as birthday parties. She further said that he sometimes hangs out with his friends after school.

According to Brandy, Christopher's relationship with Micah prior to May 2022, was as "a weekend dad." She said he never attends parent-teacher conferences, Micah's 504 Plan meetings, or medical appointments, and she estimated that he had attended one football game and one band performance in the past four to five years. When asked if she informed Christopher about Micah's 504 Plan and Individualized Education Program (IEP) Plan[3] meetings, Brandy admitted that she "did so in the beginning, yes and he just never showed up." She said that she now only informs him when either child is sick or injured or when they request that he be informed about a specific event. She said that custody exchanges usually take place between her and Christopher's mother and that it was his mother who helped her establish and maintain Micah's 504 Plan. She was unsure if OCHS ever contacted Christopher about these meetings.

---

[3] An Individualized Education Program is a plan developed for a students with disabilities who require "special education and related services to meet their unique needs and to support them in attaining both their short and long term educational goals. These services are governed by federal legislation via the Individuals with Disabilities Education Act (IDEA 2004)." https://www.louisianabelieves.com/students-with-disabilities/individualized-education-program-(iep) (last visited on September 5, 2024).

Brandy testified that Micah has been selected to participate in a two-year mechanics program through OCHS, which would prepare him to obtain an associate's degree at South Louisiana Community College. She said that Micah never mentioned the Livingston Parish program to her, and as far as she knew, he had not applied to the program.

Brandy denied that she has ever prevented Micah from speaking to Christopher or prevented Christopher from exercising custody of Micah. While she acknowledged taking Micah's cell phone away from him for a couple of months, she said she did so after finding an e-cigarette in his clothes. She explained that this was the second e-cigarette found as Christopher had found one while Micah was in his custody. She stated that when confronted, Micah argued that he should not be punished as the e-cigarette was an old one. However, Brandy stated that it still had a charge at the time she found it.

Brandy noted that as of January 2023, Christopher's child support payments were found to be $16,895.00 in arrears, for which his salary was now being garnished. She said that he stopped paying child support when he filed his ex parte motion for temporary custody because he claimed that his child support payment for Marley canceled out by her child support payment for Micah.

Lance Dawsey, DHS's principal, testified that students with passing grades and no disciplinary problems are allowed to participate in a mechanics program offered through the school. Students enrolled in the program attend classes at DHS for six hours and at the Livingston Parish Automotive Learning Center for two hours each day. When asked, hypothetically, if skipping class twenty-six times would disqualify Micah from participating in the program, Mr. Dawsey said that while excessive skipping is a disciplinary problem, as long as Micah received passing

7

grades for the classes skipped, he would still be in good standing. However, he stated that this was an issue for OCHS as it occurred while Micah was enrolled there. He said that if Micah failed a class during the school year, he would still be in good standing if he passed that class during summer school. He testified that DHS, like other Louisiana schools, provides 504 Plans or IEP Plans, which provides help to students, such as extended test-taking time.

Mr. Dawsey testified that 667 students currently attend the sixth through twelfth grade at DHS. Although he admitted that fights have occurred at DHS, he stated that the school has the fewest number of fights of all schools located in Livingston Parish. He further admitted that vapes have been found on DHS's campus, including three in the past year that contained tetrahydrocannabinol (THC). He denied that any drugs, such as cocaine or marijuana, have been found on campus.

The parties stipulated that Dr. Rollan Moore, an assistant principal at OCHS, would testify to the authenticity of Micah's student file from OCHS, that he was accepted into the mechanics program for the 2023–2024 school year, and that he "never reported being subjected to bullying or violence while at" OCHS. Micah's file establishes that he entered the ninth grade in 2021, that he was withdrawn from the school by Christopher on July 12, 2022, that he was withdrawn from DHS by Brandy on August 23, 2022, and that she re-enrolled him at OCHS on August 27, 2022. The file further reveals that Micah suffers from a Section 504 disability, dysgraphia,[4] and attention-deficit/hyperactivity disorder (ADHD). As a result of his dysgraphia, he has an Individual Accommodation Plan (IAP), which allows him increased time to complete written projects and increased time for completion.

---

[4] Dysgraphia is defined as "difficulty with producing written symbols, usually resulting in slow and poor quality handwriting." La.Admin Code tit. 28, Pt XXXV, § 101.

8

The file shows that Micah failed four of his eight subjects, including English I and Algebra I, at the end of the ninth grade, but received passing grades for these two subjects during summer school. He passed all seven subjects at the end of the tenth grade. The file also reveals that Micah skipped class on four days during the ninth grade and twenty-four days during the tenth grade. It further reveals that Micah was accepted into a mechanics program for the 2023-2024 school year.

Coleman Wilson, a mental health counselor, saw Micah eight times prior to the hearing and diagnosed him with an adjustment disorder with a disturbance of conduct, anxiety, and depression. He testified that Micah told him during these sessions that he wanted to live with Christopher in Independence so he could participate in agricultural-related activities and attend a mechanics program. Mr. Wilson said that Micah wanted to become a diesel mechanic and to join the National Guard, and he preferred the Livingston Parish mechanics program over the Lafayette program because he could finish it quicker or it would provide him with greater credentials. However, Mr. Wilson admitted that he did not independently verify this information.

Mr. Wilson stated that Micah "really wants to get out and start his adult life where he can have the most opportunity[,]" which he said was not "uncommon for a for a sixteen-year-old[.]" He further said that it was reasonable for Micah, as a teenager, to prefer to live with Christopher as he wanted to live in a smaller town, and he enjoyed outdoor activities, cooking, and working with livestock when with Christopher. When asked if Micah had provided a specific reason for wanting to live with Christopher, Mr. Wilson said that he claimed OCHS was unsafe due to drugs and fighting. However, Mr. Wilson acknowledged that this information was not based on first-hand evidence. He said that Micah's preference was also based on his

9

growing relationship with Christopher after an earlier estrangement. He testified that Micah loves Brandy and wants to maintain a relationship with both parents. While he said that Micah disagreed with Brandy over disciplinary matters, he described this as a common issue between parents and children. Although he felt that Micah was at odds with Brandy a majority of the time, Micah had never complained that she abused or neglected him.

Regarding Micah's relationship with Marley, Mr. Wilson testified that there "seems to be a fundamental difference in perspective and world view[]" between them. They do not seem to have much in common, and the only statements made by Micah regarding their relationship were negative. Micah complained that Marley stayed in her room when at Christopher's, and she either responded with silence or pushback when he tried to talk to her. While Mr. Wilson did not know if their relationship was damaged or typical of teenaged siblings, he believed that they were at odds over the present custody matter. However, he did not think that their relationship would change if Micah moved to Livingston Parish. He thought that Micah had a much better relationship with his older sister, McKenzie.

Mr. Wilson's records indicate that Micah said he wanted to attend school near Christopher due to the presence of drugs at OCHS and because he wanted to earn a mechanics certificate at the school so he could become a diesel mechanic. Micah told him that his custody-related stress was relieved by his agricultural-related hobbies. Brandy informed Mr. Wilson that Christopher removed Micah from her home without her permission and enrolled him at DHS. He noted that Micah apparently resented Brandy for removing him from DHS. Brandy further reported that she was afraid that Christopher was manipulating Micah into wanting to live with him.

10

On March 2, 2023, Mr. Wilson noted that because Micah suffered from dysgraphia, he preferred writing on a computer keyboard, and although he suffered from ADHD, he no longer took medication for that condition. Micah said that his relationship with Marley was strained, which he blamed on the issues between their parents. He said that he had a better relationship with his older sister, McKenzie.

On March 30, 2023, Micah was annoyed that Brandy still brought up the fact that Christopher had cheated on her during their marriage. Mr. Wilson noted that Micah wanted Brandy to move on from the incident "or at least 'not disrespect him in front of me.'" On April 18, 2023, Micah was upset with Brandy as he "suspect[ed] she was 'trying to keep me away from him' for being late once and it [was] effecting his time with" Christopher. On May 8, 2023, Micah reported that McKenzie moved in with Christopher when she turned eighteen because she and Brandy disagreed over whether she could quit band and soccer to concentrate on school. He reported that although Brandy slapped McKenzie after they argued, he did not feel she would do the same to him and Marley. Micah further reported that Brandy had restricted his cell-phone use for three-and-a-half months although he was not sure why.

On June 5, 2023, Micah reported that he was bored at home, and he wanted to work on a cattle farm and participate in rodeos when with Christopher but that Brandy refused permission for him to rodeo "'for no reason.'" Brandy told Mr. Wilson that she refused permission because Micah had been injured twice during "various livestock events[.]" Micah further told Mr. Wilson that he had learned that he could begin training with the National Guard at seventeen before enlisting when he turned eighteen, which would help finance his mechanics training. However, he believed that Brandy would disapprove as "[s]he doesn't trust me anymore." He reported that he was being punished because she found an old e-cigarette in his room.

11

On July 19, 2023, Micah was upset that he was spending less time with his father, which prevented him from working more during the summer. He reported that Brandy was "following court custody rules which means less time at his dad's house to work cattle ranch." Mr. Wilson noted that Micah was "considerably driven to make money and work towards a stable career as an adult." Micah wanted to attend a mechanics program near Christopher's home because he could finish it in less time than the Lafayette program, and he wanted to finish the program before he joined the National Guard. Micah expressed that he experienced some anxiety over whether he would be allowed to attend the Livingston Parish program.

At the close of the hearing, the trial court orally granted Christopher's motion to modify the prior custody decree, designating him as Micah's domiciliary parent.[5] Based on the oral ruling, physical custody of Micah was transferred to Christopher on August 8, 2023, prior to the start of the school year. A written judgment was rendered on August 11, 2023, maintaining the prior joint custody, designating Christopher as Micah's domiciliary parent, and authorizing Christopher to relocate Micah to Livingston Parish. The judgment further maintained Brandy as Marley's domiciliary parent and detailed the visitation arrangements, as worked out between the parents. It is from this judgment that Brandy appeals.

On appeal, Brandy asserts two assignments of error:

1. The trial court committed reversible error when it found that a material change in circumstances existed sufficient to modify custody.

2. The trial court committed reversible, legal error by failing to apply the appropriate legal standard necessary to effectuate a modification of a child custody decree entered into by consent.

---

[5] We note that although Christopher's motion requested that his child support payment be adjusted if he was designated Micah's domiciliary parent, the trial court did not address this issue.

## OPINION

A trial court's finding of fact in a child custody matter is entitled to great discretion and will not be disturbed on appeal absent an abuse of discretion. *Mulkey v. Mulkey*, 12-2709 (La. 5/7/13), 118 So.3d 357. This is due to the trial court's ability to better assess witness credibility as well as the testimony and evidence presented during a custody hearing in determining the child's best interests. *Rigmaiden v. Dellafosse*, 22-816 (La.App. 3 Cir. 3/29/23), 364 So.3d 472.

Where, as here, the underlying custody decree involves a consent decree, rather than a considered decree, the party seeking the modification must prove that "(1) there has been a material change of circumstances since the custody decree was entered, and (2) the proposed modification is in the best interest of the child." *Id.* at 479. Thus, in order to modify the prior consent decree, Christopher had to prove that there had been a material change of circumstances since the July 9, 2009 consent decree and that it was in Micah's best interests that he be designated his domiciliary parent.

### *Assignment of Error Number Two*

In her second assignment of error, Brandy asserts that based on statements made during its oral ruling, the trial court committed reversible legal error by failing to apply the appropriate legal standard required to modify a custody decree entered into by consent. We will address this assignment of error first as the resolution of this question determines our scope of appellate review.

Brandy claims that the trial court failed to apply the correct legal standard based on statements it made in delivering its oral ruling. This is similar to an argument made in *Aguillard v. Aguillard*, 19-757, p. 21 (La.App. 3 Cir. 7/8/20), 304 So.3d 473, 485, where the defendant argued that "'because the trial court did not

13

point to a single allegation as having been proved, it is pure speculation that the trial court found that *any* allegation was proven'" by the plaintiff, who was seeking a protective order. In response to this argument, this court stated:

> It is well settled that the trial court's reasons for judgment, oral or written, form no part of the judgment. *Bellard v. Am. Cent. Ins. Co.*, 07-1335 (La. 4/18/08), 980 So.2d 654; La.Code Civ.P. art. 1918. "[A]ppellate courts review judgments, not reasons for judgment." *Bellard*, 980 So.2d at 671. A trial court's reasons for judgment are mere explanations of its determinations which do not alter, amend, or affect the final judgment being appealed. *Wooley v. Lucksinger*, 09-571 (La. 4/1/11), 61 So.3d 507.

> Unlike Aguillard, we are mindful that while the trial court's reasons offer insight, we review judgments. We do not interpret the trial court's failure to "point to a single allegation as having been proved" in its oral reasons as conjecture. The obvious implication from the trial court's judgment is that LeBouef proved by a preponderance of the evidence her entitlement to the issuance of a protective order against Aguillard. We review judgments, not reasons for judgment, and the judgment before this court explicitly declares the trial court found LeBouef proved entitlement to a protective order. Consequently, we find this contention is not intrinsically indicative of legal error and is insufficient to provoke de novo review.

*Id.* at 485 (alteration in original).

Like in *Aguillard*, we are reviewing the trial court's August 11, 2023 judgment rather than its oral reasons for judgment, which form no part of the judgment being appealed. Thus, the trial court's failure to specifically verbalize that Christopher proved a material change in circumstances, while complicating our review of the matter on appeal, has no bearing on our ultimate analysis of the judgment pursuant to the abuse of discretion standard of review. Furthermore, as the judgment appealed modified the prior consent decree, we conclude that the trial court found that Christopher satisfactorily proved a material change in circumstances and that it was in Micah's best interests that Christopher be designated his domiciliary parent.

Accordingly, we do not find that a *de novo* review is required in this matter and will, instead, review it pursuant to the applicable abuse of discretion standard.

### *Assignment of Error Number One*

Here, Brandy asserts that the trial court manifestly erred in modifying the prior consent decree as Christopher failed to present any evidence establishing that there had been a material change in circumstances and that it was in Micah's best interest that he be designated the domiciliary parent. Following our review of the record, we find no abuse of discretion in the trial court's determination that there had been a material change in circumstances and that it was in the best interest of Micah that Christopher be designated his domiciliary parent.

In brief, Brandy argues that "as the movant, [Christopher] bore the burden to show that a material change of circumstances existed[]" and that "[a]bsolutely no evidence was presented on what, if anything, materially changed between July 9, 2009 (consent judgment) and the date of trial." We disagree.

In *Mulkey*, 118 So.3d 357, the supreme court reversed the court of appeal and reinstated a trial court judgment modifying a prior considered decree by designating the father as the domiciliary parent of the son. In doing so, the supreme court noted the particular circumstances it found to be material changes since the prior custody judgment:

> At the outset, we agree with the trial court's finding that a material change in circumstances has occurred since 2004. It is clear from the record that the dynamics of both households have changed since the previous custody order. Matthew's age, Vicki's change of employment and work schedule, Phillip's change in home environment and Matthew's academic performance are all changes that materially affect Matthew's welfare.

*Id.* at 366.

15

The supreme court particularly considered the child's age and desire to live with his father:

> Given Matthew's age and demonstrated level of maturity, and considering the particular facts and circumstances of this case, we find the record supports the trial court's finding that Phillip has met the burden of *Bergeron* [*v. Bergeron*, 492 So.2d 1193 (La.1986),] by proving that any harm caused by a modification of the 2004 custody decree would be substantially outweighed by its advantages to Matthew.

*Id.* at 368.

Here, the trial court considered Micah's request that he be allowed to live with Christopher. The record establishes, as acknowledged by Brandy, that Micah, who was three years old at the time of the original decree, is now sixteen years old. He appears from the record to be a well-adjusted teenager who has a direction as to his future.

We also find that this record established that Micah was moved from OCHS to DHS, where Christopher lives, with Brandy's knowledge and acquiescence. With her assistance, Micah attended school in Livingston Parish for two weeks, before he was suddenly and unexpectedly pulled out of DHS by Brandy. This is a change of circumstance. Further, Christopher's home situation has changed significantly. Christopher is now a police officer for the town of Livingston. He remarried in 2010, after the initial consent decree, and he and his wife own their own home, which they share with their two daughters. Micah has a loving relationship with his stepmother and his half-siblings, primarily the older one. Christopher's wife, a special education teacher, has three undergraduate degrees and is working on her master's degree in special education. This, too, is a change of circumstances from the 2009 consent decree.

Based on the foregoing, we find no abuse of discretion in the trial court's finding that a material change in circumstances materially affecting Micah's welfare has occurred since the July 9, 2009 decree. We further find no abuse of discretion in its finding that it was in Micah's best interest that custody be modified to designate Christopher as his domiciliary parent.

Louisiana Civil Code Article 134(A) sets out fourteen factors for the trial court to consider in determining whether a requested custody modification is in the best interest of the child:

(1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.

(2) The love, affection, and other emotional ties between each party and the child.

(3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7) The moral fitness of each party, insofar as it affects the welfare of the child.

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

17

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties.

(14) The responsibility for the care and rearing of the child previously exercised by each party.

The best interest of the child is the paramount consideration in any determination of child custody. *Evans v. Lungrin*, 97-541, 97-577 (La. 2/6/98), 708 So.2d 731. In *Gathen v. Gathen*, 10-2312, pp. 12–13 (La. 5/10/11), 66 So.3d 1, 9, the supreme court was called upon to determine the appropriate standard of appellate review in a custody relocation case where the trial court did not give oral or written reasons for judgment:

> Based on our review of the law, we find that the trial court is not required to expressly analyze each factor in its oral or written reasons for judgment in a relocation case. Not only does La. R.S. 9:355.12 not expressly require it, but a trial court is never required to give oral reasons and is not required to give written reasons for its "findings of fact and reasons for judgment" unless requested by a party in most types of non-jury cases. La. C.C.P. art. 1917. Had either party desired the trial court's findings of fact and reasons to be in writing, they could have asked. Further, if the legislature had intended the trial court to expressly analyze each and every factor in either oral or written reasons, it could have provided so. Consequently, we find the trial court's failure to expressly analyze each factor does not constitute an error of law that would allow *de novo* review. *See Evans v. Lungrin*, 97-541 (La.2/6/98), 708 So.2d 731, 735 (where one or more legal errors interdict the fact-finding process, if the record is complete the court of appeal must conduct a *de novo* review of the record). The appropriate standard of review, as stated in *Curole* [*v. Curole*, 02-1891 (La. 10/15/02), 828 So.2d 1094], is that the trial court's relocation determination is entitled to great weight and will not be overturned absent a clear showing of abuse of discretion.

18

While *Gathen* concerned a relocation decision, we find its analysis equally applicable to custody-modification cases and the consideration of the Article 134 factors pertaining to the best interest of the child. Indeed, this court has held that a mechanical review of each and every factor listed in Article 134 in a custody-modification case is unnecessary:

> The best interest of the child standard in a child custody case is a fact intensive inquiry that requires the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of the evidence presented. *Gary v. LeBlanc*, 16-1054 (La.App. 3 Cir. 6/7/17), 222 So.3d 784. The trial court is not required to make a mechanical evaluation of all of the factors enumerated in La.Civ.Code art. 134 in determining what is in a child's best interest for custody purposes, nor is it bound to give more weight to one factor over another; the relative weight of each factor is left to the discretion of the trial court. *Galland v. Galland*, 14-343 (La.App. 3 Cir. 11/26/14), 152 So.3d 1090, *writ denied*, 15-319 (La. 4/17/15), 168 So.3d 404.
>
> It is clear from the trial court's oral reasons that it considered many factors when denying Mr. Strother's request to modify custody. A trial court's determination in a child custody case is entitled to great weight on appeal and will not be disturbed unless there is a clear abuse of discretion. *Gremillion v. Gremillion*, 07-492 (La.App. 3 Cir. 10/3/07), 966 So.2d 1228. "Every child custody case must be viewed based on its own particular facts and relationships involved, with the goal of determining what is in the best interest of the child." *Mulkey*, 118 So.3d at 367. Based on a thorough review of the record, we cannot say that the trial court was manifestly erroneous in determining that it was not in the best interest of the child to modify custody at this time.

*Hudson v. Strother*, 17-1044, pp. 6–7 (La.App. 3 Cir. 5/2/18), 246 So.3d 851, 858.

As previously stated, "A court of appeal will not disturb the decision of the trial court unless there is a clear abuse of that discretion." *Buller v. Buller*, 22-660, pp. 5–6 (La.App. 3 Cir. 3/22/23), 363 So.3d 574, 577. Thus, we will not reverse a trial court's factual findings on appeal if they are reasonable in light of the record reviewed in its entirety. *Carranza v. Carranza*, 18-971 (La.App. 3 Cir. 6/5/19), 276 So.3d 1028.

19

In granting the motion to modify custody, the trial court orally ruled as follows:

> So today we have Mom and Dad here on custody, and I met with both of your children this morning. They're both just great kids. Your daughter was more worried about you than anything. Y'all are very close. I thought that was great. She said you all love to shop together. She talked about all the things that y'all do together and she was worried that your feelings were going to be hurt because she knew Micah was going to say he wanted to live with his dad. And, in fact, it was a very, very strongly held belief and he really wants to go live with his dad. And, it doesn't mean that he doesn't love you. He even said that. I love my mom. I'm still going to see her I just want to live with my dad. And I'm going to let him [go] live with his dad. I think it's going to be a little difficult I acknowledge that. . . . I know that both of the kids, you know, Micah loves his little sister but thinks she doesn't get him and the same way he thinks Mom doesn't get him and its only because he's a sixteen-year-old [sic]. And when they're sixteen little boys want to be with their dads usually, and little girls want to be with their moms. You know, y'all have more in common. . . .
>
> . . . .
>
> . . . [The court reporter] was with me this morning when we talked to your children. You know, and we talked a little bit about it afterwards and certainly we understand to some extent we're not in your shoes but we understand how you're feeling and what you're going through and I know that it's difficult for you. And I hope that perhaps this will make a difference in your relationship with him and I hope that he comes to appreciate you more and to understand that you do love him. You know, you're his momma and he knows you love him and he loves you. He feels disconnected right now, and I think it's just because he's a sixteen year old [sic] boy, you know. We understand what girls go through. I wouldn't understand what the boys go through. No, I wouldn't and I can remember my niece and I were always closer than my nephew and I cause we could talk and there were things that we shared and I would buy them books and we'd read the same books and we'd talk about them but its [sic] not like being a girl. You know, so I think that there are just things that a sixteen year old [sic] boy feels they can share with their dad more than they can with their mom. So we're going to change custody to dad so that he can start Doyle.

We will now review each best-interest factor in light of the evidence presented at trial.

## The Potential for the Child to be Abused, as Defined by the Children's Code Article 603

The trial court did not address this issue. However, as no evidence was presented establishing the potential for abuse as defined by La.Ch.Code art. 603(2),[6] this factor favors neither party.

## Love, Affection, and Other Emotional Ties Between Each Party and the Child

The trial court found that Micah loved Brandy and that while he wanted to live with Christopher, he still wants to see her. It further noted the strained relationship existing between them. The trial court found that this factor weighed in favor of Christopher because as a teenager, Micah would relate better to him than to Brandy. The trial court made no mention of the love, affection, or other emotional ties existing between Micah and Christopher. However, it is evident from the record that Micah has become closer to Christopher as he has grown older and developed interests in agricultural-related activities. The record further establishes that Brandy's act of agreeing and then removing Micah from DHS has strained their relationship, as has the current custody matter. Accordingly, we find that this factor weighs in favor of Christopher.

## Capacity and Disposition of Each Party to Give Child Love, Affection, and Spiritual Guidance and to Continue the Education and Rearing of the Child

This factor was not addressed by the trial court. However, the record establishes that Christopher and Brandy will both continue to love and nurture Micah during the remainder of his minority. While the issue of spiritual guidance was not addressed, the record established that both parents have encouraged Micah's desire

---

[6] Pursuant to La.Ch.Code art. 603(2)(a), abuse includes "[t]he infliction, attempted infliction, or, as a result of inadequate supervision, the allowance of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person."

21

to obtain a mechanics certificate through programs offered by DHS and OCHS. Christopher further indicated that he was supportive of Micah's wish to attend the smaller DHS over a larger school.

While Brandy was concerned that if Micah lived with Christopher, he would mimic him by quitting school in the eleventh grade, we find nothing in the record to substantiate this claim other than Brandy's own statement. Although Christopher may have quit school, he remedied his action by obtaining a GED diploma. Moreover, as special education teacher, a master's student, and the holder of three bachelor's degrees, Summer is well qualified to assist Micah with school matters as well as obtaining accommodations for his dysgraphia disability at DHS, just as Brandy has done at OCHS. Accordingly, we find that this factor weighs equally in favor of both parties.

Capacity and Disposition of Each Party to Provide the Child with Food, Clothing, Medical Care, and Other Needs

Although not addressed by the trial court, we find that this factor weighs equally in favor of both parties as both are capable of providing Micah with food, clothing, medical care, and his other material needs.

Length of Time Child has Lived in a Stable, Adequate Environment, and the Desirability of Maintaining Continuity of that Environment

While not addressed by the trial court, it is evident that Micah lived with Brandy for approximately fourteen years until his physical custody was transferred to Christopher on August 8, 2023. Since then, he has lived with Christopher and attended school at DHS. Now, Micah is seventeen years and four months old and should be starting the twelfth grade. As we find that Micah, like his older sister, will likely return to Christopher when he turns eighteen if he is returned to Brandy, this

22

factor weighs in favor of maintaining Christopher as his domiciliary parent for the remaining eight months of his minority.

## Permanence, as a Family Unit, of the Existing or Proposed Custodial Home or Homes

This factor was not addressed by the trial court. However, as discussed previously, Micah had lived with Brandy for approximately fourteen years before his physical custody was transferred to Christopher. As pointed out by Brandy, Micah and Marley had not been separated except for the brief period of time Micah lived with Christopher at the start of the 2022-2023 school year. Although Brandy has not remarried, Mr. Watson's records indicate that she had a boyfriend when he was seeing Micah. The record further establishes that Christopher has been married to Summer since 2010, and that they live in Independence with Summer's two daughters. Accordingly, as both parties have established the permanence of their family units, this factor weighs equally in each party's favor.

## Moral Fitness of Each Party, Insofar as it Affects the Welfare of the Child

As no evidence was introduced regarding the moral fitness of either party as it relates to Micah's welfare, this factor has no bearing on this matter.

## History of Substance Abuse, Violence or Criminal Activity of any Party

This factor, likewise, has no bearing on this matter.

## Mental and Physical Health of each Party

We, again, find that this factor has no bearing on this matter.

## Home, School, and Community History of the Child

This factor was not addressed by the trial court. However, as stated, Micah lived with Brandy and Marley in Lafayette for fourteen years before he moved to Independence to live with Christopher. As noted by the trial court, Micah's

relationship with Brandy has been strained, which Mr. Wilson blamed on custody and disciplinary issues. The record further establishes that Micah's relationship with Marley is also strained as a result of the custody matter and their different interests.

Micah's OCHS file, covering his ninth- and tenth-grade years, establishes that he suffers from dysgraphia for which he has accommodations allowing him additional time for writing assignments and testing. He also suffers from ADHD. At the end of the ninth grade, Micah failed four of eight subjects, including English I and Algebra I, which he retook and passed in summer school. He successfully retook the remaining two failed subjects during the tenth grade. The file further establishes that although Micah passed all of his tenth-grade subjects, he skipped class on twenty four different occasions during the school year. It also establishes that Micah was accepted into a mechanics program, which would have started at the beginning of his eleventh-grade year. According to Brandy, Micah has participated in FFA at OCHS and, although she claims that he has a lot of school friends, he spends little time with them outside of school. It is also evident that Brandy acquiesced in Micah's enrollment at DHS at the start of the 2022-2023 school year but then removed him after two weeks and re-enrolled him at OCHS.

Based on the forgoing, we find that this factor weighs in favor of Christopher.

Reasonable Preference of the Child

After conducting a *Watermeier* hearing, the trial court found that this factor weighed heavily in favor of Christopher. The record established that Micah wants to live with Christopher so he can live in a smaller town, attend DHS's mechanics program, and participate in agricultural-related activities. Mr. Wilson opined that as a sixteen-year-old boy, it was reasonable for Micah to want to live with Christopher.

Considering Micah's age and maturity and the similar interests he shares with Christopher, we find that this factor weighs in favor of Christopher.

Willingness and Ability of Each Party to Facilitate and Encourage a Close and Continuing Relationship Between the Child and the Other Party Except When Objectively Substantial Evidence of Specific Abusive, Reckless, or Illegal Conduct has Caused One Party to have Reasonable Concerns for the Child's Safety or Well-Being While in the Care of the Other Party

Although this factor was not addressed by the trial court, it is evident that it may weigh slightly in favor of Christopher. Although there is no evidence that either parent has impeded Micah's relationship with the other, the record establishes that Brandy still feels some anger towards Christopher over the dissolution of their marriage. This is evidenced by Micah's claim that she made inappropriate statements to him regarding Christopher's extramarital affair(s) during their marriage, and her act of allowing Christopher to enroll Micah at DHS only to unexpectedly remove him from the school several weeks later on the grounds that Christopher acted without her permission. Brandy further informed Mr. Watson that she was afraid that Christopher was manipulating Micah into wanting to live with him, whereas at trial, she testified that the fear was Marley's. Moreover, although Brandy said she worried that if Micah lived with Christopher, he would be in close contact with a member of Christopher's family who was a "big drug user[,]" she presented no evidence to substantiate this claim. Accordingly, we find that this factor weighs in favor of Christopher.

Distance Between the Respective Residences of the Parties

Although this factor was not addressed by the trial court, we note that Christopher lives in Independence, which is located approximately 120 miles from Youngsville, where Brandy lives. In the past, the parties have exchanged physical

25

custody with the help of Christopher's mother. We find that this factor favors neither party under the facts at issue.

Responsibility for the Care and Rearing of the Child Previously Exercised by Each Party

Although not addressed by the trial court, it is evident that Brandy, as domiciliary parent, had been Micah's primary caretaker for fourteen years, with Christopher only having physical custody of him during the times designated in the July 9, 2009 consent decree, which time would have decreased when Christopher moved to Independence. However, Christopher has been Micah's primary caretaker since August 8, 2023, with Brandy having physical custody during the time designated in the August 11, 2023 considered decree. Accordingly, we find that this factor weighs in favor of Brandy.

After reviewing the record and the foregoing factors, we find no abuse of discretion in the ruling of the trial court designating Christopher as Micah's domiciliary parent. The trial court placed great weight on Micah's stated preference for living with Christopher, which was established via the *Watermeier* hearing and Mr. Wilson's testimony and records. Our review of the best-interest factors establishes that five of the fourteen factors weigh equally in favor of both parties, four factors weigh in favor of Christopher, one factor weighs in favor of Brandy, and the remaining four factors have no bearing on this matter. Accordingly, the judgment of the trial court designating Christopher as Micah's domiciliary parent is affirmed.

**DECREE**

For the foregoing reasons, the judgment of the trial court designating Christopher David Wadsworth as the domiciliary parent of Micah Ellis Wadsworth

26

is affirmed. The costs of this appeal are assessed to Brandy Megan Broussard Wadsworth.

**AFFIRMED.**